# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| JOHN MARKOU, EVMORFIA MARKOU, DEMETRI MARKOU, PATRICIA HATABURDA, and KEITH SCHUTH, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 17 C 04917 |
| v. | ) ) ) | Judge Edmond E. Chang |
| EQUESTRIEN ESTATES HOMEOWNERS ASSOCIATION, STATE FARM, REMO TURANO, MARRY ANN BACHELOR, DANIEL NOONAN, CHARLES ENGLUND, JOHN BERNACCHI, GREG GILBERTSON, MARSHA HUNTER, JAMES SCHULTE, ARNSTEIN AND LEHR, O'HAGAN MEYER, ALLEN GOLDBERG, JENIFER H. CARCACCIOLO, DANIEL J. NOLAN, and LUKE P. SHERIDAN, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The Plaintiffs in this case—all residents of the Equestrian Estates subdivision of Lemont, Illinois—ask the Court to invalidate their homeowners' association agreement and to award damages based on allegations that the agreement was obtained by fraud in violation of their civil rights.[1] *See generally* R. 65, Second Amended Complaint.[2] The problem is that the Plaintiffs (or their associates) already asked for similar relief in state court, and lost. The Defendants

---

[1] This Court has subject matter jurisdiction over the case under 28 U.S.C. § 1331.

[2] Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

1

spotted this problem, and collectively moved to dismiss. R. 85, Mot. Dismiss. The motion is granted. The *Rooker-Feldman* and claim-preclusion doctrines prevent the Plaintiffs from re-litigating their unsuccessful state court claims in federal court. And, even if these doctrines did not bar the Plaintiffs' claims, the Second Amended Complaint largely fails to state a claim upon which relief could be granted. So the Second Amended Complaint must be dismissed. Because the Plaintiffs have already had three tries at producing a viable complaint (each attempt producing a tangle of allegations and legal citations), further amendment will not be allowed. The dismissal is for lack of subject matter jurisdiction (and thus technically without prejudice) insofar as the complaint asks the Court to review the decision of the state court, and with prejudice as to all other claims. *See Lennon v. City of Carmel, Ind.*, 865 F.3d 503, 509 (7th Cir. 2017).

## I. Background

The 300-plus allegations in the Second Amended Complaint are not easy to understand. The complaint lacks any apparent chronological or thematic organization, and frequently mixes factual allegations with difficult-to-follow legal citations and argument. *See, e.g.*, Second Am. Compl. ¶¶ 12-25, 40-45, 166-69, 262-65. The factual allegations are confusingly worded, making it at times difficult or impossible to understand what actual events are being described. *See, e.g.*, *id.* ¶ 14 ("We claim Allan Goldberg uttered a forged instrument"), ¶ 27 ("We claimed in Patricia's affidavit from 2015 Tab F Exhibit U, page 2 sec 2, case number 11 CH 21124, shows Arnstein and Lehr's response in part to State Farm."), ¶ 84 ("It was

claimed in Evmorfia's affidavit, a contract was not disclosed to her."). To make matters worse, the Plaintiffs appended hundreds of pages of supporting documentation to the complaint. This documentation comprised affidavits from the Plaintiffs and others (which contained their own factual allegations and legal arguments), and various documents purporting to prove the Plaintiffs' claims of fraud (often without context or explanation). But, as far as it is possible to discern the factual allegations, the Court takes them as true. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## A. The Parties

Before diving into the facts, it is worth giving a quick overview of the cast of characters. The Plaintiffs are all residents of the Equestrian Estates subdivision in Lemont, Illinois. *See* Second Am. Compl. Tab D ¶ 1, Tab E ¶ 1;[3] R. 92, Defs.' Br. Exh. K. Plaintiffs John and Evmorfia Markou are married, and Plaintiff Demetri Markou[4] is their son. Second Am. Compl. Tab C ¶¶ 2-3. All three reside at 6 Surrey Lane (also referred to as "6 Surrey Court") in Lemont, Illinois. *Id.* ¶ 1, Tab D ¶ 1, Tab J ¶ 1 at 1. Plaintiff Patricia Hataburda lives at 75 Horseshoe Lane in Lemont, Illinois. *See id.* Tab A Exhs. O, Q. Patricia is married to Richard Hataburda (not a party to the present case), who also lives at 75 Horseshoe Lane. *Id.* ¶ 132, Tab A

---

[3]The Plaintiffs attached extensive supporting exhibits to the Second Amended Complaint. These are organized into "tabs," and most tabs contain both affidavits and exhibits, which are identified by letters. Citations to these supporting materials will refer to them by tab number and exhibit number for the exhibits (for example, "Tab A Exh. A"), or tab number and page or paragraph number for the affidavits (for example, Tab C ¶ 1).

[4]This individual's name is spelled "Demetri Markou" in the case caption. In other places in the complaint and supporting exhibits, it is rendered "Demetrio's," *see, e.g.*, Second Am. Compl. ¶¶ 182, 240, or "Demetrios," *id.* at p. 74, ¶ 297. The opinion will use the spelling in the caption.

Exh. Q. Finally, Plaintiff Keith Schuth resides at 35 Horseshoe Lane in Lemont, Illinois. *Id*. Tab E.

The Plaintiffs have sued a number of different defendants. (Many of these defendants' names are misspelled in the Second Amended Complaint and the case caption, so the spelling of the defendants' names is taken from the Defendants' brief. *See* Defs.' Br. at 1.) The first group of defendants is associated with the Equestrian Estates Homeowners Association ("the HOA" for short). These include the HOA itself and a group of individuals who appear to be current or former HOA board members: Greg Gilbertson, Remo Turano, Mary Ann Bachelor, Daniel Noonan, Marsha Hunter, Charles Englund, James Schulte, and John Bernacchi. *See id*. State Farm Fire and Casualty Company, the HOA's insurer, is also a defendant. *Id*.; *see also* Second Am. Compl. at p. 2-3.[5] The Plaintiffs also sued State Farm's former law firm, O'Hagan Meyer, and two O'Hagan Meyer attorneys, Daniel Nolan and Luke Sheridan. Defs.' Br. at 1; *see* Second Am. Compl. at p. 3-4. Finally, the HOA's law firm, Arnstein & Lehr, LLP, and two Arnstein attorneys, Allan Goldberg and Jenifer Caracciolo, are also named as defendants. Defs.' Br. at 1; *see* Second Am. Compl. at p. 1-2, ¶ 2.

## B. Adoption of the Amended Declaration

The major thrust of the Second Amended Complaint is that the Equestrian Estates Homeowners Association improperly amended its governing declaration to

---

[5]The Second Amended Complaint contains both numbered paragraphs and several pages of non-numbered text. Citations to the numbered paragraphs will be identified with a "¶" symbol; citations to the non-paragraph-numbered text will be by page number, with the abbreviation "p." to differentiate the page numbers from the paragraph numbers.

the Plaintiffs' detriment. *See* Second Am. Compl. at p. 1-3. According to the Plaintiffs, the HOA and its associates engaged in all kinds of shady conduct to secure approval of the Amended Declaration. For example, in order to get the homeowner signatures needed to approve the amendment, HOA members allegedly lied to homeowners about what they were signing. *See, e.g., id.* ¶¶ 67, 91-92, 277. Evmorfia Markou was told that the card she was signing was "for a gift" when it was actually a consent to modify the HOA declaration. *Id.* ¶¶ 82, 84. Keith Schuth was similarly deceived. HOA board member James Schulte allegedly got Keith drunk and got him to sign a consent card by telling Keith that it was "to have his information on file." *Id.* ¶¶ 97-98. The complaint also alleges that Evmorfia Markou was "coerced" to sign John Markou's name without his knowledge or consent, but does not explain the nature of the coercion. *Id.* ¶ 85. There are also allegations that some signatures were forged, but without many details. *See id.* ¶¶ 78, 92.

The Plaintiffs also argue that the adoption of the Amended Declaration was procedurally improper. It is difficult to fully understand these allegations, but the gist is that the Original Declaration governing Equestrian Estates[6] set out certain procedures for amendments, which were not followed during the adoption of the Amended Declaration. The complaint alleges that, per the Original Declaration, no amendment was allowed to take effect unless homeowners were given 90 days' written notice of the proposed change. *Id.* ¶ 55. At that point, the "committee" had a year to get the then-owners of two-thirds of the lots to sign a "fully disclosed dated

---

[6]The Plaintiffs call the Original Declaration the "organic declaration," *see id.* at p. 3.

notarized contract/instrument with verifiable witnesses." *Id.* (emphasis omitted). Instead of following these procedures, Defendants Mary Ann Bachelor and James Schulte falsely certified that the homeowners received 90 days' notice and that the required percentage of homeowners had voluntarily consented to the amendment. *See id.* ¶¶ 64-66, 69. The HOA's lawyer, Defendant Allan Goldberg of Arnstein & Lehr, was the "princip[al] author" of the improper Amended Declaration, *id.* at p. 1, and allegedly knew that the Amended Declaration was not consistent with the Original Declaration, *id.* ¶ 10.

### C. State Court Litigation

In 2011, litigation commenced over the Amended Declaration. The Second Amended Complaint is not especially clear on what happened, when it happened, or who was involved. But the Defendants included certain pleadings and opinions from the various state court cases surrounding the Declaration in the exhibits to their brief. The Court takes judicial notice of these state court documents because they are a matter of public record. *See, e.g.*, *Milwaukee Police Ass'n v. Flynn*, 863 F.3d 636, 640 (7th Cir. 2017) (citation omitted). It is also fair to consider these documents because they are incorporated by reference in the Second Amended Complaint. *Id.* These pleadings and opinions provide a clearer picture of what happened in the various state court cases.

#### 1. The 2011 Chancery Litigation and the 2011 Law Litigation

In 2011, Patricia Hataburda brought a lawsuit in Cook County Chancery Court, *Patricia Hataburda v. Equestrian Estates Homeowners Association*, 11 CH

09468. Hataburda sought a judgment that the Amended Declaration was "a nullity and unenforceable" for more or less the same reasons outlined in the Second Amended Complaint, plus some additional arguments. *See* Defs.' Br. Exh. B, 2011 Chancery Complaint ¶¶ 4, 10-18, 28-30, 54(A). That same year, Hataburda filed another lawsuit, this time in the Law Division, captioned *Patricia Hataburda v. Daniel Noonan*, 11-L-65043. This lawsuit alleged that then-HOA board member Daniel Noonan had breached his fiduciary duties by failing to disclose 2011 Chancery litigation to HOA members, and claimed malicious prosecution based on a forcible entry and detainer action filed against Patricia Hataburda. Defs.' Br. Exh. D, 2011 Law Complaint ¶¶ 2, 7, 36. Eventually, Patricia Hataburda entered into a settlement agreement releasing her claims in both cases. Defs.' Br. Exh. C, Patricia Hataburda Settlement Agreement.

The Second Amended Complaint alleges that this settlement agreement was obtained through underhanded conduct by the HOA, its board members, Hataburda's then-attorney Thomas Murphy, and the judge in the case. The Plaintiffs allege that when the Hataburdas arrived at the courthouse to try to negotiate a settlement, two Arnstein & Lehr attorneys, Defendant Jenifer Caracciolo[7] and Mary Cannon Veed (not a defendant in this case) were meeting with the judge in the jury room. *Id*. ¶ 132. Several HOA members were also present in the jury room, including Defendants Daniel Noonan, Greg Gilbertson, and Marsha Hunter. *Id*. ¶ 133. The Hataburdas' attorney was called into the room, but

---

[7]Her name is misspelled as "Jenifer H. Carcacciolo" in the Second Amended Complaint. *See* Mot. Dismiss at 1.

the Hataburdas were told to stay outside. *Id.* ¶ 134. When the Hataburdas were finally allowed into the room, they were told that they had to sign the settlement agreement or pay Arnstein & Lehr's court costs. *Id.* ¶ 136. Someone (the complaint does not say who) told the Hataburdas "you can't win against such a prestigious law firm." *Id.* ¶ 136 (emphasis omitted). The judge and Veed then "grilled" the Hataburdas, and the judge told them that the HOA was "mandatory" and that they were members "like it or not." *Id.* ¶ 138 (emphasis omitted). During this conversation, Murphy was silent and unhelpful. *Id.* ¶ 137. The Plaintiffs allege that the HOA bribed Murphy to "take a DIVE" and not object to this "aggressive coercion." *Id.* ¶ 148 (capitalization in the original). Patricia eventually signed the settlement agreement, but her husband refused. *Id.* ¶¶ 139, 141.

Patricia regretted her decision, and sent the presiding judge a letter titled "Agreement under Duress." *Id.* ¶ 161; *see also* Second Am. Compl. Tab A Exh. N. In this letter, Patricia explained that she felt that she had signed the agreement under duress and asked to "continue my lawsuit." Second Am. Compl. Tab A Exh. N. One of the judge's staff attorneys responded, stating that they had received the letter, but that they would not read it due to concerns over improper *ex parte* communication. *Id.* Tab A Exh. O. The letter recommended that Patricia speak to her attorney to resolve her issues, and also advised her that she could file appropriate motions before the judge with notice to the other side. *Id.* Patricia's attorney was copied on the letter. *Id.*

8

## 2. The State Farm Declaratory Judgment Litigation

Also in 2011, State Farm, the HOA's insurer filed an action in Cook County Chancery Court seeking a declaratory judgment that State Farm was not responsible for the costs of the Hataburda litigation. *See* Defs.' Br. Exh. E, State Farm Complaint. This case was captioned *State Farm Fire & Casualty Co. v. Equestrian Estates Homeowners Association and Patricia Hataburda*, 11 CH 21124. The state court held that State Farm had a duty to insure the HOA for the Hataburda lawsuit. Defs.' Br. Exh. F, State Farm Opinion.

The plaintiffs in this federal case were only peripherally involved in the State Farm litigation (Patricia Hataburda was a nominal defendant; the rest were not parties at all). The Second Amended complaint contains, however, a number of allegations related to the State Farm litigation. The Plaintiffs argue that the State Farm Declaratory Judgment Litigation demonstrates State Farm's knowledge of the fraud underlying the Amended Declaration, because the basis of State Farm's complaint was that it did not have a duty to insure fraud. Second Am. Compl. at p. 2. This appears to be a misreading of State Farm's lawsuit, which asserted only that Patricia's *allegations* fell outside the scope of State Farm's coverage. *See generally* Mot. Defs.' Br. Exh. E, State Farm Complaint. State Farm did *not* argue that the Amended Declaration itself was fraudulent. *Id*.

The Plaintiffs also allege that Arnstein & Lehr attorneys falsely claimed during the State Farm declaratory judgment litigation that the Equestrian Estates Association did not own a common area. Second Am. Compl. at p. 2-3, Tab A Exh. L

at 2. The Second Amended Complaint does not explain what impact this false statement had on the State Farm litigation or on the Plaintiffs.

### 3. The 2012 Chancery Litigation

In 2012, a group of Equestrian Estates homeowners brought a case in Cook County Court alleging that the Amended Declaration was unlawful (case number 12 CH 19220). The original plaintiffs were Patricia Hataburda, Eve Markou,[8] Susan Hamdan, and Keith Schuth. Defs.' Br. Exh. G, 2012 Chancery Complaint. The complaint named the HOA as a defendant, along with several board members, some of whom are now defendants in the federal case. The plaintiffs later amended their complaint, substituting Richard Hataburda for Patricia Hataburda, and dropping all the defendants except the HOA, Remo Turano, Mary Ann Bachelor, and Daniel Noonan. *See* Mot. Dismiss Exh. H, 2012 Chancery Amended Complaint. The amended complaint was confusingly drafted, but generally alleged that the Amended Declaration was invalid. *See generally id.* The amended complaint in the 2012 Chancery Litigation made substantially the same factual allegations in support of this argument as the Second Amended Complaint does in the current federal case. Specifically, the amended complaint alleged that homeowners had been tricked or intimidated into signing signature cards, *id.* ¶ 11; the amendment had not been approved by the "then owners of two thirds of the Lots," *id.*; the HOA failed to provide the required notice, *id.*; and the defendants later falsely represented that the Amended Declaration was properly adopted, *id.* ¶ 12. It

---

[8]"Eve" is apparently Evmorfia Markou's nickname. *See* Second Am. Compl. p. iii, Tab A Exhs. T-V; *id.* ¶¶ 82, 84, 87.

further alleged that the defendants had attempted to collect "unlawful assessments" based on the Second Amended Declaration, and that when the homeowners would not pay the assessments, the defendants filed liens and collection lawsuits against them. *Id*. ¶¶ 14-15.

The defendants moved to dismiss the amended complaint. *See* Second Am. Compl. Tab P. The Cook County Circuit Court granted the motion and dismissed the amended complaint with prejudice. Defs.' Br. Exh. I, Appellate Court Opinion, case no. 1-14-0431 at 1. In 2015, the Illinois Appellate Court issued a written order affirming the dismissal. *Id*.

### D. Other Allegations

### 1. Debt Collection Efforts

Apart from the factual allegations related to the adoption of the Amended Declaration and the resulting litigation, there are a number of allegations about the defendants' efforts to collect "unlawful debt," accompanied by citations to the Second Amended Complaint's attached exhibits. *See, e.g.*, Second Am. Compl. ¶¶ 167, 176, 191, 216-226. Although the references to "unlawful debt" are vague on their own, the citations to the accompanying documents make clear that the plaintiffs are referring to efforts to enforce HOA rules and collect HOA fees. *See* Second Am. Compl. Tab O Exh. J (Hataburda HOA account statements); Tab A Exh. Y (John and Evmorfia Markou HOA account statements); Tab B Exh. I (letter to Markou family regarding HOA fines); Tab A Exh. Z, Tab E Exh. I (Schuth HOA

account statements and eviction documents). The Plaintiffs characterize these debt collection efforts as "extortion." *See, e.g.*, Second Am. Compl. ¶¶ 167, 217, 284, 295.

## 2. Defendants' Receipt of Evidence of Fraud

Many of the allegations and exhibits in the Second Amended Complaint are dedicated to showing that various defendants were made aware of the supposed fraud surrounding the Amended Declaration. *See, e.g.*, Second Am. Compl. Tab K, Tab N. For example, the complaint alleges that State Farm knew or should have known at the time of the declaratory judgment action that the Amended Declaration was fraudulent. *Id*. at p. 2-3. It also states that "notice was brought directly home to State Farm at the end of the appellate case of systemic fraud." *Id*. at p. 3. Although these accusations are difficult to understand, it seems that in 2015 (around the time of the issuance of the Appellate Court opinion in the 2012 Chancery lawsuit), the Plaintiffs sent a number of affidavits with supporting documentation to State Farm and/or State Farm's attorneys at O'Hagan Meyer. *See* Second Am. Compl. ¶¶ 108-118. State Farm did not respond to these documents, and continued to insure the HOA. *Id*. ¶¶ 118, 125, p. 3. The Plaintiffs apparently sent similar documents to Arnstein & Lehr in 2015. *See id*. ¶¶ 241-42. Arnstein & Lehr and the HOA continued to "assault" the plaintiffs with "bills of unlawful debt" even after receiving these documents. *Id*. ¶ 243.

## II. Legal Standard

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of*

*Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

On the other hand, a Rule 12(b)(1) motion tests whether the Court has subject matter jurisdiction, *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009); *Long v. ShoreBank Dev. Corp.*, 182 F.3d 548, 554 (7th Cir. 1999). When evaluating a motion to dismiss under Rule 12(b)(1), if there are no factual disputes, then the Court accepts the allegations in the complaint as true, and draws all reasonable inferences in the plaintiff's favor. *See Bultasa Buddhist Temple of Chi. v. Nielsen*, 878 F.3d 570, 573 (7th. Cir. 2017). That said, "a plaintiff faced with a 12(b)(1) motion to dismiss bears the burden of establishing that the jurisdictional requirements have been met." *Ctr. for Dermatology and Skin Cancer, Ltd. v. Burwell*, 770 F.3d 586, 588-89 (7th Cir. 2014).

### III. Analysis

### A. Rooker-Feldman

The Defendants move to dismiss the Second Amended Complaint based on the *Rooker-Feldman* doctrine. *See Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). The

idea behind *Rooker-Feldman* is that the Supreme Court is the only federal court with jurisdiction to review the decisions of state courts in civil cases. *Johnson v. Orr*, 551 F.3d 564, 567 (7th Cir. 2008). This means that any request for "a remedy for an injury caused by [a state court] judgment" cannot be granted. *Id.* at 568 (7th Cir. 2008) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). The "vital question" for application of *Rooker-Feldman* is "is whether the federal plaintiff seeks the alteration of a state court's judgment." *Milchtein v. Chisholm*, 880 F.3d 895, 898 (7th Cir. 2018). If there is "no way for the injury complained of by a plaintiff to be separated from a state court judgment," then *Rooker-Feldman* applies. *Mains v. Citibank*, 852 F.3d 669, 675 (7th Cir. 2017) (quoting *Sykes v. Cook Cty. Cir. Ct. Prob. Div.,* 837 F.3d 736, 742 (7th Cir. 2016)).

In this case, only the 2012 Chancery Litigation plausibly triggers *Rooker-Feldman*. Although Patricia Hataburda brought two lawsuits in 2011 raising similar issues, those lawsuits both ended in a settlement agreement, and there is no reason to think that any state court adopted the settlement or incorporated it into a judgment. *See Crestview Village Apartments v. United States Dept. of Housing and Urban Development*, 383 F.3d 552, 556 (7th Cir. 2004) ("For *Rooker-Feldman* purposes, a state court approved settlement agreement is a judgment or decision.") (cleaned up).[9] And, although the state court did enter a judgment in the State Farm declaratory judgment litigation, the defendants do not argue that that judgment has any preclusive effect in this case (rightly so, because the declaratory judgment

---

[9]This opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See, e.g., United States v. Reyes*, 866 F.3d 316, 321 (5th Cir. 2017).

14

litigation involved the very different insurance-coverage issues). *See* R. 92, Defs' Br. at 9-12. That leaves the 2012 Chancery litigation.

### 1. Which Plaintiffs?

The Supreme Court has cautioned that *Rooker-Feldman* "is a narrow doctrine, confined to cases brought by state-court losers complaining of injuries caused by state-court judgments." *Lance v. Dennis*, 546 U.S. 459, 465 (2006) (quoting *Exxon Mobil*, 544 U.S. at 284) (cleaned up). *Rooker-Feldman* does not bar actions by nonparties to the earlier state-court judgment simply because those parties could be considered to be in privity with a party to the judgment under state-law preclusion rules. *Id*. at 466.

Only two of the federal court plaintiffs in this case—Evmorfia Markou and Keith Schuth—were also parties to the 2012 Chancery Litigation. Patricia Hataburda was a named plaintiff in the original complaint, but she dropped out when the complaint was amended, and the amended complaint was the operative complaint as of the state court judgment, *see* Defs.' Br. Exh. I at 1. John and Demetri Markou were never parties to the litigation. *Rooker-Feldman* therefore bars any claims by Evmorfia or Keith that seek to alter the 2012 Chancery judgment, but does not block claims by John, Demetri, or Patricia.

The Defendants assert that the reach of *Rooker-Feldman* is much broader, and argue that *Rooker-Feldman* applies to *all* of the plaintiffs, even those who were not party to the prior lawsuit. This is the case, the Defendants assert, because the new federal plaintiffs are "functionally identical" to the plaintiffs in the 2012

15

Chancery Litigation. That argument stretches *Rooker-Feldman* too far. *Lance* explicitly held that courts cannot import state law concepts of privity into the *Rooker-Feldman* doctrine. 546 U.S. at 466. It is true that the Supreme Court hinted that there might be some circumstances where *Rooker-Feldman* might be applied against a nonparty to a state court proceeding—for example, "where an estate takes a *de facto* appeal in a district court of an earlier state decision involving the decedent." *Id*. at 466 n.2. But the Seventh Circuit has not developed the boundaries of this possible exception to the general rule stated in *Lance*. And the expansion that Defendants propose is dramatic: the nonparties that Defendants seek to bar in this case are the spouses and child of the state-court litigants. Even assuming that all the family members live together, they are still distinct individuals with distinct legal interests, unlike a decedent and the decedent's estate. Holding that *Rooker-Feldman* would bar a state court loser's spouse and children from asserting claims simply because they have similar legal interests risks doing exactly what the Supreme Court forbade in *Lance*: "erroneously conflat[ing] preclusion law with *Rooker-Feldman*." *Id*. So here, Evmorfia and Keith are the only plaintiffs against which *Rooker-Feldman* applies.

## 2. Which Claims?

The next question is which, if any, of Evmorfia and Keith's claims are barred by *Rooker-Feldman*. Again, the crucial question is whether the claims seek, in effect, to alter a state court judgment. *Milchtein*, 880 F.3d at 898. Although it is difficult to trace the Plaintiffs' legal theories with precision, it appears that most or

16

all of the claims in the Second Amended Complaint are efforts to attack the state court's judgment. The allegations that the Amended Declaration was improper because it was obtained using fraudulent signature cards, or because the amendment was inconsistent with the Original Declaration, were presented to and rejected by the Illinois courts. The Plaintiffs do not explain how these allegations might be connected to some other injury independent of the state court judgment upholding the Amended Declaration. Similarly, the allegations that the Arnstein & Lehr attorneys presented false evidence to the Illinois courts during the 2012 Chancery Litigation are transparent efforts to attack the state court judgment. *See* Second Am. Compl. at p. 1, ¶¶ 1-2, 22. Even if the state court judgment was obtained by fraud, as the Second Amended Complaint alleges, this Court cannot overturn the state court's decision. *Iqbal v. Patel*, 780 F.3d 728, 729 (7th Cir. 2015).

The same goes for the claims arising from the Defendants' efforts to collect HOA fees from Keith and Evmorfia. Even if the fee-collection attempts happened after the state court judgment, they still are purported injuries *caused* by the state court's decision that the Amended Declaration is valid. The complaint does not allege that these fees were wrongful in some way independent of the state court judgment—for example, that the HOA was trying to collect fees that were not actually imposed by the Amended Declaration, or that that the HOA was falsely contending that the plaintiffs were breaking HOA rules. Asking the Court to find that the fee collection efforts were fraudulent or extortionate based on the fraud underlying the Amended Declaration is just another way of asking the federal

17

district court to deprive the state court ruling of effect. *See, e.g., Mains v. Citibank, N.A.*, 852 F.3d 669, 677 (7th Cir. 2017) (dismissing FDCPA claims because "the debt that [the Defendants] tried to collect was the one authorized by the state foreclosure judgment," so the injuries "are therefore not independent of nor extricable from the state-court judgment."); *Harold v. Steel*, 773 F.3d 884, 886-87 (7th Cir. 2014) (Plaintiff's claim against creditor was barred by *Rooker-Feldman* because the source of Plaintiff's injury was the underlying state court decision that Plaintiff owed the debt). *Rooker-Feldman* bars these claims as well.

It does not matter that Evmorfia and Keith have added some new defendants who were not parties to the state court case. Of course, if Evmorfia and Keith had some claims against these new defendants that did not stem from the state court judgment, those claims would not fall within the reach of *Rooker-Feldman*. But all Evmorfia and Keith allege is that the new defendants contributed in various ways to procuring the state court judgment, or to enforcing the judgment after it was issued. That means that awarding relief against these defendants for the actions described in the Second Amended Complaint would require altering the state court judgment. Adding new defendants does not change the fact that the plaintiffs are effectively trying to appeal a state court judgment in federal district court. The *Rooker-Feldman* doctrine "cannot be gotten around by changing the *dramatis personae*." *Newman v. State of Indiana*, 129 F.3d 937, 942 (7th Cir. 1997); *see also Pletos v. Makower Abatte Guerra Wegner Vollmer, PLLC*, 2018 WL 1870380, at *3 (6th Cir. Apr. 19, 2018) (non-precedential disposition) (holding that state-court

18

losers who had sued their homeowners' association in state court could not dodge *Rooker-Feldman* merely by adding homeowners' association board members as defendants).

Nor does it matter that the Plaintiffs' efforts to attack the state court judgment are framed as RICO or civil rights claims. It is well established in the Seventh Circuit that litigants cannot "circumvent the *Rooker-Feldman* doctrine by recasting a request for the district court to review state-court rulings as a complaint about civil rights, due process, conspiracy, or RICO violations." *Wallis v. Fifth Third Bank*, 443 F. App'x 202, 204-205 (7th Cir. 2011) (non-precedential disposition); *see also, e.g.*, *Holt v. Lake Cty. Bd. of Comm'rs*, 408 F.3d 335, 336 (7th Cir. 2005); *Taylor v. Fed. Nat'l Mortg. Ass'n,* 374 F.3d 529, 534 (7th Cir. 2004). No matter the packaging, the factual allegations and legal claims in this federal case are clearly attempts to undo the adverse state court judgment, and so are barred by *Rooker-Feldman*.

Finally, although there are some allegations that do not appear to be directly connected to the judgment in the 2012 Chancery case—allegations of unfair conduct during the Hataburda settlement negotiations, for example, and the allegedly false statements made by Arnstein & Lehr lawyers in other litigation—none of those events are connected to injuries suffered by Keith Schuth or Evmorfia Markou independent of the state court judgment. So, in the end, all of Keith and Evmorfia's claims are barred by *Rooker-Feldman*.

19

## B. Claim Preclusion

Next up is the Defendants' argument that the Plaintiffs' claims are barred by claim preclusion. The doctrine of claim preclusion (also known as *res judicata*) provides that a final judgment on the merits by a court of competent jurisdiction is conclusive as to the rights of the parties and their privies. *Agolf, LLC v. Vill. of Arlington Heights*, 946 N.E.2d 1123, 1130 (Ill. App. Ct. 2011). Claim preclusion is an absolute bar to a later action between the same parties or their privies involving the same claim, demand, or cause of action. *Id*. Because an Illinois court rendered the relevant final judgment (the judgment in the 2012 Chancery Litigation), Illinois preclusion law applies. *Arlin-Golf, LLC v. Vill. of Arlington Heights*, 631 F.3d 818, 821 (7th Cir. 2011).

For claim preclusion to apply, three things must be true. First, there must be a final judgment on the merits rendered by a court of competent jurisdiction. Second, there must be an identity of cause of action. Third, there must be an identity of the parties or their privies. *Nowak v. St. Rita High School,* 757 N.E.2d 471, 477 (Ill. 2001). There is no question in this case that the Circuit Court had jurisdiction and entered a final judgment on the merits, or that the Illinois Appellate Court had jurisdiction to consider and affirm the judgment. That leaves only the second and third elements.

### 1. Identity of Cause of Action

Under Illinois law, separate claims are considered the same cause of action if they arise from a single group of operative facts. *Agolf*, 946 N.E.2d at 1131. Claim

20

preclusion bars any claim that *could* have been raised and decided in the first suit, regardless of whether the claim was *actually* decided. *La Salle Nat. Bank v. Cty. Bd. of School Trustees of Du Page Cty.*, 337 N.E.2d 19, 22 (Ill. 1975). So, even if different legal theories are asserted in the later action, the requirement of identity of cause of action is satisfied if the claims arise from the same set of facts. *Agolf*, 946 N.E.2d at 1131. This also means that claim preclusion applies even to claims against newly named defendants, provided the claims arise out of the same set of operative facts. *Watkins v. Ingalls Memorial Hospital*, — N.E.3d —, 2018 WL 2089265, at *12 (Ill. App. Ct. 2018); *see also Muhammad v. Oliver*, 547 F.3d 874, 877 (7th Cir. 2008) (applying Illinois law).

As discussed above in the *Rooker-Feldman* context, the vast majority of the factual allegations in the present complaint were already presented to the Illinois courts in the 2012 Chancery litigation. The 2012 case alleged the same series of facts that are alleged now: the HOA and its board members obtained signature cards by deceit and fraud, the HOA passed the Amended Declaration without the proper notice or votes, the Amended Declaration is inconsistent with the Original Declaration, and the HOA attempted to collect fees based on the Amended Declaration. *See* Mot. Dismiss Exh. H. This means that any claims arising out of these operative facts are barred by claim preclusion (so long as the third element, identity of parties, is satisfied). It does not matter that these claims are now framed as RICO or civil rights claims. What's more, to the extent that some of the claims about debt collection arose after the final state court judgment, those are still

21

barred because, as discussed, they are simply attempts to re-litigate the prior judgment.

## 2. Identity of Parties

Claim preclusion applies only to parties to the prior action, or those who were in privity with a party to the prior lawsuit. *Agolf*, 946 N.E.2d at 1131-32. "Privity" is the idea that "as to certain matters and in certain circumstances persons who are not parties to an action but who are connected with it in their interests are affected by the judgment with reference to interests involved in the action, as if they were parties." *City of Chi. v. St. John's United Church of Christ,* 935 N.E.2d 1158, 1167-68 (Ill. App. Ct. 2010) (quoting *Purmal v. Robert N. Wadington & Assocs.,* 820 N.E.2d 86, 94 (Ill. App. Ct. 2004)). Privity exists between a party to the prior suit and a nonparty when the party to the prior suit adequately represented the same legal interests as the nonparty. *Agolf*, 946 N.E.2d at 1132. More specifically, Illinois courts have held that privity exists "between parties who share a mutual or successive relationship in property rights that were the subject of an earlier action." *Id*.

As discussed above, only two of the plaintiffs in this case (Keith Schuth and Evmorfia Markou) were also named plaintiffs in the 2012 Chancery Litigation. Patricia Hataburda's husband, Richard Hataburda, was a plaintiff in the 2012 Chancery Litigation, but is not a party to this case. Patricia Hataburda, John Markou, and Demetri Markou are all plaintiffs in the current federal case, but were not parties to the prior state court case. But, because Patricia, John, and Demetri

are in privity with the parties to the 2012 Chancery Litigation, the judgment in that case is binding on them as well.

The property deed for the Markou property shows that John and Evmorfia Markou (who are husband and wife) are co-owners and tenants-in-common of their property.[10] Mot. Dismiss Exh. J. A record search of documents stored by the Cook County Recorder of Deeds reveals that Richard and Patricia Hataburda are both listed on mortgage documents and liens related to the property located at 75 Horseshoe Lane, Lemont, IL (property identification number 22-24-302-007-0000).[11] Indeed, the Plaintiffs' own complaint and supporting documentation confirm that the John and Evmorfia Markou and Richard and Patricia Hataburda are co-owners of their respective properties. For example, the HOA invoices that the Plaintiffs attached to the complaint are addressed to "Richard & Pat Hataburda, 75 Horseshoe Lane" and to "John and Eva Markou, 6 Surrey Court." Second Am. Compl. Tab A Exhs. Q, Y. Patricia refers in her affidavit to "our property" (in reference to herself and her husband Richard). *Id*. Tab F at p. 4. John and Evmorfia Markou both state that they reside at the same property, 6 Surrey Court, in Lemont, IL. *Id*. Tab C ¶ 10, Tab D ¶1.

Demetri Makou's status is the most complicated, because he is not a co-owner of either property. At the very least, however, he is (per his own allegations), his

---

[10]The Court takes judicial notice of this document and the Hataburdas' property records.

[11]The Defendants attached a document purporting to be the Hataburda's property deed to their brief. *See* Defs.' Br. Exh. K. It is not clear how this document alone would prove that the Hataburdas are joint tenants of 75 Horseshoe Lane, because the deed itself does not seem to list the Hataburdas' names.

parents' tenant. In his affidavit, Demetri states that he also lives at 6 Surrey Court in Lemont, IL. *Id.* Tab J at 1. He also states that he is "on trust" for the home, *id.*, and the complaint refers to the home of the "Markou family," *id.* ¶ 298. Whatever "on trust" means, it is clear that Demetri Markou resides at his parents' home at 6 Surrey Court.

For purposes of a dispute over homeowner fees, that is enough for privity under Illinois law. Patricia Hataburda is in privity with her husband Richard, who was a party in the prior lawsuit, because they are co-owners and co-tenants of the property at issue in this lawsuit. John and Demetri Markou are both in privity with Evmorfia Markou because John is a co-owner of the property that was the subject of the lawsuit, and because all three are tenants of that same property. Indeed, the Illinois courts have found parties to be in privity based on more attenuated relationships. In *Agolf*, for example, the Illinois Appellate Court held that the owner of a shopping center was bound by a decision rendered against one of its tenants. *Agolf*, 946 N.E.2d at 220-21. The court in *Agolf* reasoned that the parties were in privity because they shared the same legal interest and because the tenant adequately represented that interest in the first lawsuit. *Id.* at 221. The court rejected the argument that the parties had differing interests because one was a mere tenant with "only a finite interest" in the property. *Id.* The court noted that any potential differences in the parties' interests were "nothing more than conjecture and speculation," and concluded that the interests of landlord and tenant were "so closely aligned" as to be in privity. *Id.* at 222.

24

In this case, there is not even a suggestion that Richard Hataburda's interest in his property would be meaningfully different than Patricia's, or that Evmorfia Markou's interests would be different from John or Demetri's. Indeed, the Second Amended Complaint does not appear to distinguish between injuries suffered by any of the individual plaintiffs, and does not suggest that individual family members suffered injuries not experienced by others.[12] That is not surprising, because the parties are complaining about the same alleged injury (the harm caused by false Amended Declaration) to the same property interests (the parties' interests in their respective residences). So the legal interests of the Hataburdas and the Markous are much more alike than the landlord and tenant in *Agolf*: all have an almost identical interest in attempting to undo the Amended Declaration and preventing the resulting HOA fees and assessments. There is also no reason to think that the state-court plaintiffs failed to adequately represent those interests. Even a cursory review of the complaints and the appellate court opinion from the 2012 case reveals that the plaintiffs in that case presented the issues at least as well as the plaintiffs in this case have done. *See* Mot. Dismiss Exhs. G-I. The legal interests of all the current plaintiffs thus were adequately represented in the 2012 Chancery Litigation.

To sum up, because all the plaintiffs in the current case were either parties to the 2012 Chancery Litigation or in privity with parties to the 2012 Chancery Litigation, the Plaintiffs' claims are barred by claim preclusion insofar as they

---

[12]The exception might be the Hataburda settlement agreement, which was signed by Patricia but not Richard. That sequence of events, however, does not seem to be related to the main set of allegations about the fraudulent Amended Declaration.

assert claims that arise out of the same set of facts that was the subject of the 2012 lawsuit. That means that the claims that the Amended Declaration was falsely adopted, that it is inconsistent with the Original Declaration, and that efforts to enforce the Amended Declaration are unlawful, are all precluded by the prior judgment.[13]

## C. Failure to State a Claim

Even if the plaintiffs had managed to surmount the hurdles of *Rooker-Feldman* and claim preclusion, most of their claims would still have to be dismissed under Rule 12(b)(6). The Plaintiffs assert that the Defendants are running a RICO enterprise, violated the Plaintiffs' civil rights, and violated federal criminal statutes. *See* Second Am. Compl. at p. 1. But for all its sprawling accusations and voluminous exhibits, the Second Amended Complaint fails to state any plausible claim upon which relief can be granted.[14]

### 1. RICO

First up are the Plaintiffs' claims that the Defendants are running an illegal RICO enterprise. The Racketeer Influenced and Corrupt Organizations Act (RICO),

---

[13]The Defendants argue that Patricia Hataburda's claims are also barred by the release contained in the settlement agreement that Patricia signed in 2011. Release of a claim is an affirmative defense. *United States v. Rogers Cartage Co.*, 794 F.3d 854, 860 (7th Cir. 2015). Although dismissal based on a release might be proper "when all the facts necessary to rule on the affirmative defense are properly before the court on the motion to dismiss," *id.*, that is not the case here. Patricia alleges that the release is invalid because it was signed under duress, which is a claim that the Court would need some factual development to properly address. Dismissal based on the release would be improper at this stage.

[14]There are some narrow exceptions—certain fraud claims might be supported by enough factual allegations to survive a Rule 12(b)(6) motion—but as explained earlier, those are blocked by *Rooker-Feldman* or claim preclusion.

18 U.S.C. § 1961 *et seq.* makes it unlawful to "conduct or participate … in the conduct of [an] enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Injured parties can bring civil lawsuits against violators of Section 1962(c). 18 U.S.C. § 1964(c). Unfortunately for the Plaintiffs, liability under Section 1962(c) requires a "pattern of racketeering activity" or "collection of unlawful debt," neither of which has been plausibly alleged.

First, although the Plaintiffs refer many times to efforts to collect "unlawful debt," *see, e.g.*, Second Am. Compl. ¶¶ 167, 176, 191, 216-226, "unlawful debt" has a particular meaning in the RICO context. The RICO statute defines "unlawful debt" as debt incurred in connection with illegal gambling, or in the business of lending money at a usurious rate. 18 U.S.C. § 1961(6). There is no allegation anywhere in the complaint or the attached documents that the debts the Defendants sought to collect were connected in any way with gambling. Nor is there any suggestion that those debts were incurred or contracted in the business of lending money at a usurious rate. There is an allegation that reads: "We claim the 12% usury Keith is being charged falls under involuntary servitude." Second Am. Compl. ¶ 255. That paragraph appears to be referring to interest charged on Keith Schuth's past-due HOA payments. The Plaintiffs do not allege that the HOA (or anyone else) was in the business of lending Keith money or anything else of value, or that the 12% rate was "at least twice the enforceable rate" as required by 18 U.S.C. § 1961(6).

The Plaintiffs also claim that the Defendants engaged in a pattern of racketeering activity by committing the RICO predicate acts of bribery and extortion. *See, e.g.*, Second Am. Compl. ¶¶ 150, 197, 216-22. But no act of either bribery or extortion has been plausibly alleged. The "bribery" identified by the complaint is the payment to Patricia Hataburda's attorney during settlement negotiations. *See id.* ¶ 150. Payments to *private* attorneys (that is, attorneys who are not government officials), even for improper purposes, are not bribery as defined by the Illinois or federal bribery statutes. *See* 720 ILCS 5/33-1; 18 U.S.C. § 201. The federal bribery statute prohibits bribery of public officials, people who have been selected to be public officials, or witnesses who testify under oath. *See* 18 U.S.C. § 201. Similarly, the Illinois statute prohibits bribery of public officers, public employees, jurors, or witnesses. *See* 720 ILCS 5/33-1. The complaint does not allege that Patricia's attorney was a public officer, official, or employee, and he was clearly not a juror or a witness testifying under oath. So the alleged payment to Patricia's attorney was not criminal bribery and cannot be a RICO predicate act.

The Plaintiffs also assert that the HOA and its associates committed dozens of acts of extortion by sending the Plaintiffs HOA bills and account statements, fining them for violations of HOA rules, and attempting to collect debts by filing liens and foreclosure actions against delinquent homeowners. *See* Second Am. Compl. ¶¶ 166-67, 191, 197, 212, 216-22, 258, 283-84. The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official

right." 18 U.S.C. § 1951(b)(2). Illinois has an analogous criminal statute prohibiting "intimidation," which can also be the basis of a RICO predicate act. *Ruiz v. Kinsella*, 770 F. Supp. 2d 936, 942 (N.D. Ill. 2011). Under Illinois law, the crime of intimidation occurs when a person "communicates to another … a threat to perform without lawful authority" a variety of wrongful acts. 720 ILCS 5/12-6. These acts include inflicting physical harm or unlawful confinement; committing a felony or Class A misdemeanor; accusing a person of an offense; exposing the person to hatred, contempt, or ridicule; taking or withholding official action; or bringing about or continuing a strike, boycott, or other collective action. *Id*.

The actions described in the Second Amended Complaint are simply not extortion or intimidation. The Plaintiffs do not allege that any Defendant threatened force or violence, or committed any of the actions enumerated in the Illinois intimidation statute. There is also no reason to think that the Defendants acted under color of official right in attempting to collect HOA assessments or enforce HOA rules: no factual allegations suggest that any defendant abused a position as a public official in order to obtain payment in return for performing official acts. *See United States v. Carter*, 530 F.3d 565, 574 (7th Cir. 2008). Although there are conclusory legal assertions that "the HOA is acting under the color of law, and under the color of authority," Second Am. Compl. ¶ 262, *see also* ¶¶ 264-65, these assertions are not *facts*, and are not entitled to the presumption of truth. Finally, there is no basis to infer that the Defendants obtained payments through wrongful use of fear. It might be the case that the Defendants imposed some

29

economic pressure—in the form of demands for payment and filing liens and evictions and the like—but economic pressure is generally not extortion if the defendant has a claim of right to the property. *Rennell v. Rowe*, 635 F.3d 1008, 1012 (7th Cir. 2011). As noted above, the Defendants allege that the demands for payment were wrongful because they were based on the supposedly fraudulent Amended Declaration, but do not otherwise claim that the HOA was demanding payments to which it had no right. The application of economic pressure to collect money due under the Amended Declaration does not constitute wrongful use of fear, because the HOA had a claim of right to that property.

The Plaintiffs have not managed to allege any RICO predicate acts, so there is no need to address whether they have successfully alleged the other elements of a RICO claim (conduct of an enterprise, et cetera). Any RICO claim must be dismissed due to the absence of predicate acts.

## 2. Civil Rights

Next up are the various civil rights violations claimed or hinted at throughout the Second Amended Complaint. These are even harder to follow than the RICO claim, but it is nevertheless clear that the Plaintiffs have no viable claims.

The Plaintiffs cite three civil rights statutes: 42 U.S.C. § 1981, 42 U.S.C. § 1985, and 42 U.S.C. § 1986. Second Am. Compl. at p. i. Section 1981 guarantees certain equal rights under the law, including the right to make contracts. Section 1985(3) deals with conspiracies to deprive others of their civil rights, and Section

30

1986 deals with neglecting to prevent misconduct mentioned in Section 1985. Both Section 1981 and Section 1985(3) deal with deprivations of civil rights based on race. To state a Section 1981 claim, Plaintiffs would need to allege that (1) they are members of a racial minority; (2) the Defendants had the intent to discriminate on the basis of race; and (3) the discrimination concerned the making or enforcing of a contract. *Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 756 (7th Cir. 2006). Meanwhile, for a Section 1985(3) claim, the Plaintiffs would need to allege that the conspiracy to deprive them of their civil rights was motivated by race- or class-based discrimination. *Thorncreek Apartments Ill., LLC v. Mick*, 886 F.3d 626, 634 (7th Cir. 2018); *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971). The Second Amended Complaint does not allege or even suggest that the Plaintiffs' misfortunes were caused by racial, class-based, or national origin discrimination.[15] And, because the Plaintiffs have not stated a claim under Section 1985, their Section 1986 claim necessarily fails as well. *Hicks v. Resolution Trust Corp.*, 970 F.2d 378, 382 (7th Cir. 1992) ("Of course, in the absence of a viable claim under § 1985(3), a § 1986 claim cannot exist.").

Finally, the Plaintiffs assert that they have been subjected to involuntary servitude in violation of the Thirteenth Amendment to the United States

---

[15]During a hearing on the Plaintiffs' motion for preliminary injunction, the Court pointed out that that Section 1981 claim was unlikely to succeed because the Second Amended Complaint did not allege any racial discrimination. Demetri Markou responded that he was Greek. But neither he nor any other plaintiff has asked leave to amend the complaint to add allegations of discrimination based on national origin. Even if they had moved to amend, the Court would not grant permission: this is the third iteration of the complaint, so the plaintiffs have had plenty of opportunity to add supporting factual allegations.

Constitution. Second Am. Compl. ¶¶ 205-212, 255. The Defendants respond that there is no private right of action directly under the Thirteenth Amendment. Whether that is right or not, any Thirteenth Amendment claim fails because the Plaintiffs have not alleged anything that can fairly be characterized as involuntary servitude within the meaning of the Thirteenth Amendment. The Plaintiffs claim that mandatory membership in the homeowners' association, being made to sign a settlement agreement under duress, being charged fees based on the Amended Declaration, having liens on their homes, and being charged high interest rates constitute "involuntary servitude." *See id.* ¶¶ 205-207, 212, 255. But, as the Supreme Court has pointed out, the Thirteenth Amendment "was intended to cover those forms of compulsory labor akin to African slavery." *Butler v. Perry*, 240 U.S. 328, 332 (1916). The Plaintiffs' problems, however lamentable, are nothing like compulsory slave labor.

Indeed, very early in the life of the Thirteenth Amendment, the Supreme Court held that the Thirteenth Amendment was not intended to reach run-of-the-mill injuries to property: "To withdraw the mind from the contemplation of this grand yet simple declaration of the personal freedom of all the human race within the jurisdiction of this government—a declaration designed to establish the freedom of four millions of slaves—and with a microscopic search endeavor to find in it a reference to servitudes, which may have been attached to property in certain localities, requires an effort, to say the least of it." *Slaughter-House Cases*, 83 U.S. 36, 69 (1872). The Court continued: "That a *personal* servitude was meant is proved

by the use of the word 'involuntary,' which can only apply to human beings." *Id.* (emphasis added). The Plaintiffs have not alleged that they were forced to work for the defendants against their will in a manner akin to slavery, so the Thirteenth Amendment has nothing to do with the conduct they allege. *Cf. Edgar v. Inland Steel Co.,* 744 F.2d 1276, 1278 n.4 (7th Cir. 1984) (rejecting argument that income tax withholding is involuntary servitude); *Walton v. Claybridge Homeowners Ass'n, Inc.*, 433 F. App'x 477, 479 (7th Cir. 2011) (non-precedential disposition) (stating that "[Plaintiff's] allegation that the state-court judgment runs afoul of the Thirteenth Amendment is preposterous."); *Deich-Keibler v. Bank One*, 243 F. App'x 164 n.1 (7th Cir. 2007) (non-precedential disposition) (dismissing claim that contract's no-hire provision violated the Thirteenth Amendment as "frivolous").

### 3. Federal Criminal Statutes

In addition to their civil claims, the Plaintiffs cite and quote a number of federal criminal statutes. These include 18 U.S.C. § 880 (receiving proceeds of extortion), 18 U.S.C. § 4 (misprision), and 18 U.S.C. §§ 1621 and 1622 (perjury and subornation of perjury). In general, private citizens may not attempt to enforce criminal statutes in the absence of explicit provisions for private civil action. *See Chapa v. Adams*, 168 F.3d 1036, 1037 (7th Cir. 1999) (noting the Supreme Court's reluctance to use criminal law as the basis of a private civil action); *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (holding that a "private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."). True to that trend, there is no civil cause of action for violation of the federal criminal statutes

cited by the Plaintiffs. *See, e.g.*, *Tucker v. Bank One N.A.*, 265 F. Supp. 2d 923, 925 (N.D. Ill. 2003) (no private right of action under 18 U.S.C. § 4); *Acevedo v. Cerame*, 156 F. Supp. 3d 1326, 1329 (D. N.M. 2015) (no private right of action under 18 U.S.C. § 880); *Traveler v. CSX Transp., Inc.*, 2007 WL 1830807, at *2 (N.D. Ind. June 22, 2007) (no private right of action under 18 U.S.C. § 1621); *Zajac v. Clark*, 2015 WL 179333, at *8 (M.D. Fla. Jan. 14 2015) (no private right of action under 18 U.S.C. § 1622).

### 4. Fraud

Throughout the Second Amended Complaint, the Plaintiffs characterize various actions, institutions, and documents as "fraud" or "fraudulent." *See, e.g.*, Second Am. Compl. ¶¶ 45, 65, 81, 94, 99. It is not entirely clear whether the Plaintiffs are attempting to state some kind of common-law fraud claim, but the Court will address that argument for the sake of thoroughness.

Federal Rule of Civil Procedure 9(b) requires that "[i]n alleging fraud or mistake, a party must state *with particularity* the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b) (emphasis added). In other words, the complaint "must describe the who, what, when, where, and how of the fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441-42 (7th Cir. 2011) (cleaned up). Most of the allegations of fraud are far too vague to state a viable claim under the heightened Rule 9(b) standard. For example, Paragraph 176 states that "The claims made [in 2015] showed conclusive evidence of … fraud … against us, the good People of Equestrian Estates." Second Am.

Compl. ¶ 176 (brackets in original; emphasis omitted). This allegation tells the Court nothing about what the supposed fraudulent statements were, who was involved, or when the fraud happened. To give another example, Paragraph 214 states that, "This organization has filed false fraudulent liens on every home owner in Equestrian Estates." *Id*. Again, this allegation provides none of the information that would be needed to successfully state a claim of fraud: it does not say what made the liens "fraudulent," who filed the liens, or even what year any of this happened. Most of the fraud allegations in the complaint follow this pattern, and so fail to state a claim.

There are two possible exceptions. First, there is a set of allegations about how the HOA procured Evmorfia's signature consenting to the Amended Declaration. The complaint alleges that in April 2000, the HOA induced Evmorfia Markou to sign a signature card by falsely telling her that she was signing to receive a housewarming gift. Second Am. Compl. ¶¶ 81-82, 87. Along the same lines, the complaint alleges that in summer 2003, HOA board member James Schulte had "a few shared alcoholic beverages" with Keith Schuth, and got Keith to sign a card that Keith thought was "to have his information on file." *Id*. ¶ 97. There are enough details about these two transactions to potentially state a fraud claim. But even if the Plaintiffs could get around the statute of limitations for these claims—which is not at all likely—the claims are barred by *Rooker-Feldman* and claim preclusion, as explained earlier. Evmorfia and Keith lost on those claims in

the state court litigation, and cannot have a second bite at the apple. *See* Mot. Dismiss Exh. I.

### 5. Failure to Respond to Evidence of Fraud

The Plaintiffs devote much of the Second Amended Complaint and the attached exhibits to demonstrating that State Farm, State Farm's law firm O'Hagan Meyer, and O'Hagan Meyer's employees knew about the supposed fraud perpetrated in connection with the Second Amended Declaration. *See, e.g.*, Second Am. Compl. at p. 2 ("STATE FARM knew of the improperly amended declaration all the way back in 2011") (capitalization in original); p. 4 ("Luke P. Sheridan and Daniel J. Nolan of O'Hagan Meyer had knowledge of a commission of a felony in August 2014."). The gist of the argument seems to be that the Plaintiffs sent "conclusive evidence" of fraud and other offenses to various defendants in 2015, and that the defendants somehow harmed the Plaintiffs by continuing to provide services to the HOA after receiving this "evidence." *See id.* ¶¶ 176, 117 ("State Farm even paid for the appellate court case, after they received actual Notice of introduction of fabricated evidence in the middle of august 2015") (emphasis omitted); *id.* ¶ 127 ("We claim State Farm and O'Hagan Meyer find themselves in dishonor, that they did not act in good faith, and stayed silent by voluntary conduct") (emphasis omitted).

The Plaintiffs do not connect these allegations to any particular legal theory of recovery, and it is not clear that there is any basis for granting relief based on the facts alleged. The Plaintiffs make much of the fact that State Farm and its agents

"stayed silent" after receiving the Plaintiffs' mailings. *See, e.g.*, *id.* at p. 3, ¶¶ 118-120. But State Farm and its attorneys had no particular obligation to respond to the series of documents sent to them by the plaintiffs outside the context of any formal legal proceeding. Nor is there any reason to think that it was illegal for State Farm to continue to insure the HOA after receiving the Plaintiffs' documents. *See, e.g.*, *id.* at p. 3 ("money from State Farm went directly to fund a criminal enterprise … State Farm paid for the appellate court case as well in 2015 … after notice was brought directly home to State Farm … of systematic fraud") (emphasis omitted), ¶ 121. State Farm had a contractual duty to insure the HOA. Nothing about the documents apparently sent by the Plaintiffs—which seem to have comprised a hodgepodge of "affidavits," legal arguments and disjointed evidence, *see id.* Tab B, ¶¶ 6-7, 31-36, 116, 191—would erase that contractual duty. And, even if the Plaintiffs had presented ironclad evidence of "fraud" on the part of the HOA, they have cited no legal authority (and the Court is aware of none) to support the proposition that State Farm would somehow be liable to the HOA's alleged victims for continuing to insure the HOA. In short, the Plaintiffs have no claim based on the series of allegations about State Farm's allegedly deficient response to their "evidence" of fraud.

### 6. Patricia Hataburda's Settlement Agreement

The Plaintiffs also discuss in detail the events surrounding Patricia Hataburda's signing of the settlement agreement in connection with her two 2011 cases. *See, e.g.*, Second Am. Compl. ¶¶ 201-203. It is not clear what claims, if any,

they believe arise out of that event (apart from the already-dismissed arguments that the supposed bribery was a RICO predicate act and that the settlement violated the Thirteenth Amendment). Some of the allegations about the settlement are closely followed by a lengthy quotation from 28 U.S.C. § 7102, defining "abuse or threatened abuse of the legal process" and "involuntary servitude." *See* 22 U.S.C. § 7102(1), (6). But these citations come from the Trafficking Victims Protection Act, and the allegations in the complaint have nothing to do with human trafficking.

What's more, most of the parties against whom Patricia might have a claim— her lawyer, the presiding judge—are not named as defendants. Although she does allege that some of the defendants in this case were involved in the settlement negotiations, she does not assert that they were the ones who berated her into settling. *See* Second Am. Compl. ¶¶ 133-143. Even if it is true that some of the defendants engaged in unethical *ex parte* communication with the judge, it is not clear why Patricia would have standing to bring a civil suit based on that unethical communication. The clearest wrongful conduct alleged to have been carried out by an actual defendant is the allegation that the HOA bribed Patricia's attorney to take a dive. *Id*. ¶ 148. But the only legal argument that the Plaintiffs make about that action is that it is a "criminal act" which constitutes a RICO predicate offense. *Id*. ¶ 150. The argument that the bribe was a RICO predicate act has already been considered and rejected, and the Plaintiffs do not connect the bribe with any other civil cause of action. Because the Plaintiffs have not pointed to any valid civil claim

that could arise from this set of allegations, they have not stated a claim based on the Hataburda settlement negotiations.

## IV. Conclusion

In the end, none of the Plaintiffs' claims survive the motion to dismiss. All of Keith and Evmorfia's claims are barred by *Rooker-Feldman*, and all of the Plaintiffs' claims surrounding the adoption and enforcement of the Amended Declaration are barred by claim preclusion. Even if this was not the case, none of the allegations (with the possible exception of two very narrow fraud claims, which are barred by *Rooker-Feldman*) state a claim upon which relief can be granted. There will be no fourth chance to amend, so all the claims are dismissed, and this is the final judgment in the case.

ENTERED:

       s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: June 18, 2018